Raul **HERNANDEZ, Plaintiffs,**

v.

**Matthew CATE, et al., Defendants.**

**Case No. EDCV 11–00627 R (AJW).**

United States District Court, C.D. California, Eastern Division.

Jan. 18, 2013.

Raul Hernandez, Blythe, CA, pro se.

Leena M. Sheet, CAAG–Office of CA Attorney General, Los Angeles, CA, for Defendants.

### ORDER ACCEPTING REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

MANUEL L. REAL, District Judge.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the Court has reviewed the Report and Recommendation of Magistrate Judge ("Report") and the objections to the Report, and the Supplemental Report and Recommendation. Good cause appearing, the Court accepts the findings and recommendations contained in the Report after having made a de novo determination of the portions to which objections were directed.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

ANDREW J. WISTRICH, United States Magistrate Judge.

#### Proceedings

Plaintiff, a state prisoner proceeding pro se and in forma pauperis, filed a verified civil rights complaint[1] against state prison officials. The complaint seeks monetary, declarative, and injunctive relief against defendants in their individual and official capacities.

Defendants Long, Wiggins, Phillips, Busby, Rettagliata, Palmer, Cate, and Arneson filed a motion to dismiss the complaint and a request for judicial notice. Plaintiff filed an opposition to the motion with supporting exhibits. Defendants filed a reply memorandum, as well as objections

---

1. The complaint consists of a completed form complaint ("Complaint, Part I"), an attached typed complaint ("Complaint, Part II"), and attached exhibits ("Ex.") "A" and "B".

to, and a request to strike, extrinsic evidence plaintiff filed with his opposition. Plaintiff was granted leave to file a sur-reply opposing the request to strike that evidence.[2]

### Plaintiff's Allegations

Plaintiff alleges the following facts, which are accepted as true for purposes of this motion to dismiss.

Plaintiff, who was born in Guatemala, is incarcerated at Ironwood State Prison ("ISP"). At all relevant times, the California Department of Corrections and Rehabilitation ("CDCR") classified his ethnicity as "Other." The CDCR also classified plaintiff as having no gang affiliation or association. [Complaint, Part II at 6 & Ex. B19–B22].

On December 4, 2009, a Mexican inmate in Facility "D" at ISP committed a battery on staff. As a result, all Mexican inmates and all inmates who associated or are affiliated with the Mexican inmates were placed either on "lockdown" or on "modified program." Modified program "means, but ... is not limited to, the suspension of all affected inmates' movement and privileges, and that all inmates will be fed in their cells." Plaintiff was not placed on lockdown or modified program status because he is classified as "Other." [Complaint, Part II at 6 & n. 1].

On December 6, 2009, defendant Wiggins sent a memorandum to defendant Payton advising him that "[i]n the best interest of the safety and security of the facility as well as the institution and all staff and inmates affected," 17 "Other" inmates, including plaintiff, would be placed on modified program status until Payton could "review the situation and provide clarification on how you want this situation handled." [Ex. A1]. Wiggins explained that the "Program Status Report"

stated that inmates classified as "Other" who "associat[e] with Hispanic Inmates" were to be placed on modified program status. Wiggins explained that "[i]n speaking to facility control booth officers, floor staff and yard staff," it had been determined that the 17 "Other" inmates identified in his memorandum, including plaintiff,

> associate with the general Hispanic/Mexican population. This was determined by their utilization of certain housing unit showers and whom they associate with in the dayroom or on the yard. Other open information was utilized was [sic] visual observations, by staff, of which inmates they associate with or "hang out with."

[Ex. A1]. Accordingly, plaintiff was placed on modified program status effective December 6, 2009. Wiggins told plaintiff that he was being "locked down with the Mexicans" because of the way he looked and his name. [Complaint, Part II at 7].

Defendant Pinson sent Payton a similar memo on December 8, 2009. Pinson advised Payton that the same seventeen "Other" inmates, including plaintiff, would be placed on modified program status and "will maintain the same program as the Hispanic/Mexican population as per the Program Status Report" until further notice. [Ex. A3].

Prison staff members also told defendants that "White" prisoners associate, affiliate, and hang out with Mexican inmates in the dayroom or yard and use the same showers, but no "White" prisoners were locked down or placed on modified program status due to the incident involving the Mexican inmates. [Complaint, Part II at 7].

---

**2.** Defendants' request for judicial notice and their motion to strike were granted in part and denied in part. [*See* Orders filed Aug. 22, 2012].

On January 12, 2010, plaintiff filed a group inmate appeal contending that he was being placed on lockdown and discriminated against on the basis of his race and Spanish surname. Prison officials denied plaintiff's appeal on the ground that plaintiff was placed on modified program status because he associated or lived with Mexican inmates. [Complaint, Part II at 7–10 & Ex. B1–B21].

On or about February 6, 2010, Mexican inmates in Facility D committed a battery on another Hispanic prisoner, resulting in serious injury. Mexican inmates and any inmates that lived or affiliated with them were placed on lockdown. [Complaint, Part II at 7–8].

On February 7, 2010, defendant Palmer submitted a memorandum to Payton identifying inmates classified as "Black" or "Other," including plaintiff, who were placed on modified program status until further notice because prison staff had determined that they were associated, affiliated, or lived with Mexican inmates. [Complaint, Part II at 8 & Ex. A6].

Defendants relied on "false" and "misleading" information to place plaintiff on modified program status and failed to interview staff from plaintiff's housing unit and other witnesses who would have stated that plaintiff does not associate or live with Mexican inmates. [Complaint, Part II at 6, 8–9]. Defendants do not place "Other" inmates who associate with African–American inmates on modified program status when the African–American general population is on lockdown. [Complaint, Part II at 9].

On February 14, 2010, plaintiff's mother, who was elderly and dying, came to visit him with other family members. ISP visiting staff told his mother that plaintiff could not have visits because he is a Mexican inmate. [Complaint, Part II at 10]. During plaintiff's placement on modified program status with the Mexican inmates, he endured extended denials of his privileges or rights with respect to movement, feeding, ducats, visiting, work, showering, medical care, recreation, packages, phone calls, religious services, and use of, or access to, the library, dayroom, and canteen. [Complaint, Part II at 10].

A third incident involving Mexican inmates occurred in Facility "D" on or about October 7, 2010. However, no inmates were placed on modified program status as a result of this incident. [Complaint, Part II at 10].

On or about October 10, 2010, a fourth incident occurred in Facility "D" involving eight Mexican inmates, fighting four against four. A lockdown occurred affecting Mexican inmates and certain other inmates, but plaintiff was allowed to continue his normal program until October 12, 2010, when Wiggins approached him in the exercise yard and ordered plaintiff to return to his housing unit and lock up. Plaintiff began to explain that he was an "Other," but Wiggins said, "You got to lock up because you look like a Mexican and your name is Spanish." Plaintiff returned to his cell and was placed on modified program status. [Complaint, Part II at 11].

Plaintiff submitted his group inmate appeal to defendant Cate for director's (third) level of review on or about April 13, 2010. [Complaint, Part II at 10 & Ex. B–3].

Plaintiff alleges that defendants intentionally discriminated against him on the basis of his race, without legitimate penological justification, in violation of his Fourteenth Amendment equal protection and due process rights. Plaintiff further alleges that defendants' conduct violated his Eighth Amendment right to be free from cruel and unusual punishment, and that defendants violated the Racketeer Influenced and Corrupt Organizations

("RICO") Act. [Complaint, Part I at 5; Complaint, Part II at 12–15].

### Standard governing dismissal

A complaint may be dismissed for failure to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(b)(6). Where, as here, a prisoner is proceeding in forma pauperis, or seeks relief against a governmental entity or officer or employee of a governmental entity, the court "shall" dismiss the complaint or any portion thereof at any time if it is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A(b); 42 U.S.C. § 1997e(c)(1).

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (internal quotation marks and ellipsis omitted).

To determine whether a complaint states a claim sufficient to withstand dismissal, a court considers the contents of the complaint and its attached exhibits, documents incorporated into the complaint by reference, and matters properly subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322–323, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); *Lee v. City of Los Angeles,* 250 F.3d 668, 688 (9th Cir.2001). The court must accept as true all factual allegations contained in the complaint. That principle, however, "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. A pro se complaint, however, is "to be liberally construed," and "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 93–94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam) (citing *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)); *see Hebbe v. Pliler,* 627 F.3d 338, 342 (9th Cir.2010) (stating that "we continue to construe pro se filings liberally when evaluating them under *Iqbal,*" and "particularly in civil rights cases, ... to afford the [plaintiff] the benefit of any doubt") (quoting *Bretz v. Kelman,* 773 F.2d 1026, 1027 n. 1 (9th Cir.1985) (en banc)).

### Abuse of judicial process

Defendants contend that plaintiff's complaint should be dismissed because it is malicious and frivolous, and that plaintiff abused the judicial process by filing it in forma pauperis. [Defendants' Notice of Motion and Motion to Dismiss ("Defendants' MTD") at 6–7].

In a civil action in which a prisoner is proceeding in forma pauperis, or seeks relief against a governmental entity or officer or employee of a governmental entity, the court "shall" dismiss the complaint or any portion thereof at any time if it is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A(b); 42 U.S.C. § 1997e(c)(1). A claim is frivolous if it has

little weight or importance or has no basis in law or fact. A case is malicious if it was filed with the "intention or desire to harm another." *Andrews v. King*, 398 F.3d 1113, 1121 (9th Cir.2005).

 The elements of an abuse of process claim are that "the defendant (1) contemplated an ulterior motive in using the process; and (2) committed a willful act in the use of the process not proper in the regular conduct of the proceedings. In other words, abuse of process requires an act outside the purpose of the process." *Blaxland v. Commonwealth Director of Public Prosecutions*, 323 F.3d 1198, 1204 (9th Cir.2003) (quoting *Brown v. Kennard*, 94 Cal.App.4th 40, 44, 113 Cal.Rptr.2d 891 (2001)).

 Defendants argue that this action is frivolous, malicious, and an abuse of process because it is plaintiff's third civil rights action brought pro se and in forma pauperis on the same issues. [*See* Defendants' MTD 6–7]. In support of that argument, defendants requested judicial notice of two prior cases they contend were filed by plaintiff: (1) *Hernandez v. Ollison*, EDCV 06–1010 R(RC), filed in this district on September 19, 2006; and (2) *Hernandez v. Marshall*, C–94–4296 DLJ, filed in the Northern District of California in 1994. [*See* Defendants' Request for Judicial Notice ("Defendants' RJN"), Exhibits 1 & 2]. Defendants' request for judicial notice was granted with respect to *Ollison* and denied with respect to *Marshall*, which was filed not by plaintiff but by a different individual with the same name. [*See* Order filed Aug. 22, 2012].

In *Ollison*, plaintiff alleged that during October 2005 and November 2005, ISP officials violated his First and Fourteenth Amendment rights to freely associate and .communicate with fellow inmates without fear of prosecution or discrimination by locking him down for incidents involving Mexican inmates.[3] [*See* Defendants' RJN, Ex. 1 at AGO–12]. The district court dismissed *Ollison* for failure to state a First Amendment freedom of association claim. [Defendants' RJN, Ex. 1 at AGO–30 through AGO–47]. The judgment of dismissal was affirmed by the Ninth Circuit, which declined to "consider [plaintiff's] contentions regarding equal protection and harassment because he did not raise these claims in district court." [*See* Defendants' RJN, Ex. 1]. In this action, plaintiff alleges Eighth and Fourteenth Amendment claims, which were not pleaded or litigated in *Ollison*. Plaintiff has not attempted to plead any First Amendment free association claims in this case. Defendants have neither argued nor shown that the affirmative defenses of claim preclusion or issue preclusion bar plaintiff from proceeding with the claims alleged in this action.[4]

Standing alone, the fact that plaintiff filed a prior section 1983 action against defendants based on similar facts does not establish that this action lacks a legal or factual basis, was filed with the intent to harm defendants, or had an ulterior or improper motive in filing this action. Therefore, defendants' motion to dismiss this action as frivolous, malicious, or an abuse of judicial process should be denied.

---

**3.** The complaint and attached exhibits appear to use the terms "Mexican," "Hispanic," and "Hispanic/Mexican" synonymously. This report uses the term "Mexican inmates" to describe the ethnicity or national origin of inmates who allegedly perpetrated the assaults described in the complaint, while the term " 'Other' Hispanic" is used to described the

ethnicity of "Other" inmates, including plaintiff, who are not Mexican but whose ethnicity or national origin derives from Central or South America.

**4.** The Court expresses no opinion as to the merits of such a defense.

### Failure to exhaust prison administrative remedies

Defendants contend that prior to filing this action, plaintiff failed to exhaust his prison administrative remedies with respect to being placed on modified program status due to the February 7, 2010 and October 12, 2010 incidents. [Defendants' MTD 7–10].

■ A prisoner must exhaust administrative remedies by properly utilizing and completing the prison's administrative review process in accordance with the applicable procedural rules before filing a court action challenging prison conditions, so long as some form of relief is available through the administrative remedy procedure. *See Woodford v. Ngo,* 548 U.S. 81, 85, 93, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 731, 734, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). The exhaustion requirement is mandatory, and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 524, 122 S.Ct. 983. A prisoner must fully exhaust prison administrative remedies before filing suit in federal court. *McKinney v. Carey,* 311 F.3d 1198, 1199–1200 (9th Cir. 2002) (per curiam).

■ Defendants "have the burden of raising and proving the absence of exhaustion," and they properly characterize their motion for failure to exhaust prison administrative remedies as an "unenumerated" Rule 12(b) motion. *Wyatt v. Terhune,* 315 F.3d 1108, 1119 (9th Cir.) ("[T]he failure to exhaust nonjudicial remedies that are not jurisdictional should be treated as a matter in abatement, which is subject to an unenumerated Rule 12(b) motion rather than a motion for summary judgment."), *cert. denied,* 540 U.S. 810, 124 S.Ct. 50, 157 L.Ed.2d 23 (2003); *see Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (holding that a prisoner's failure to exhaust administrative remedies is an affirmative defense under the PLRA). In ruling on an unenumerated Rule 12(b) motion to dismiss for a failure to exhaust administrative remedies, "the court may look beyond the pleadings and decide disputed issues of fact. If the district court concludes that the prisoner has not exhausted nonjudicial remedies, the proper remedy is dismissal of the claim without prejudice." *Wyatt,* 315 F.3d at 1119–1120 (citing *Ritza v. Internat'l Longshoremen's & Warehousemen's Union,* 837 F.2d 365, 368–369 & n. 3 (9th Cir.1988) (per curiam)) (footnote omitted).

■ "The distinction between summary judgment and dismissal for matters in abatement bears on the district court's authority to resolve factual disputes ...." *Ritza,* 837 F.2d at 369. A court ruling on an unenumerated Rule 12(b) motion to dismiss for a failure to exhaust administrative remedies "may look beyond the pleadings and decide disputed issues of fact," provided that the district court has assured that a prisoner-plaintiff received fair notice of his opportunity to develop a record regarding exhaustion. *See Wyatt,* 315 F.3d at 1119–1120 & n. 14 (citing *Ritza,* 837 F.2d at 368–369 & n. 3). Plaintiff received fair notice under *Wyatt* and submitted evidence regarding exhaustion. [*See* Notice to Pro Se Inmate filed Oct. 27, 2011; Order filed Aug. 22, 2012].

■ Where the evidence in support of and in opposition to an unenumerated Rule 12(b) motion creates a factual dispute, "the general view is that there is no right of jury trial as to that issue," and "that the court has a broad discretion as to the method to be used in resolving the factual dispute." *Ritza,* 837 F.2d at 369. "No presumptive truthfulness attaches to plain-

tiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself" the issue whether exhaustion occurred. *Ritza,* 837 F.2d at 369. "If the district court concludes that the prisoner has not exhausted nonjudicial remedies, the proper remedy is dismissal of the claim without prejudice." *Wyatt,* 315 F.3d at 1119–20 (citing *Ritza,* 837 F.2d at 368–369 & n. 3). On appeal, the district court's factual findings are reviewed for clear error, and its application of substantive law is reviewed de novo. *See Wyatt,* 315 F.3d at 1120.

### California's inmate administrative appeal procedure

During all relevant times, a California state inmate generally was required to complete several procedural steps to exhaust prison administrative remedies: (1) informal resolution, except where waiver of this level was authorized; (2) first level formal written appeal; (3) second level formal written appeal to the institution head or designee; and (4) third level formal written appeal to the Director of the California Department of Corrections and Rehabilitation. An inmate was required to submit an appeal within 15 working days of the event or decision being appealed, or of receiving an unacceptable lower level appeal decision. *See* Cal. Code Regs. tit. 15, §§ 3084.1–3085 (2009)[5]; *Ngo,* 548 U.S. at 85–86, 126 S.Ct. 2378 (summarizing California's inmate appeal procedure).

### December 2009 incident

Defendants do not argue that plaintiff's claims arising from the December 2009 incident are unexhausted. However, they contend that plaintiff's inmate appeal regarding that incident was submitted in January 2010 and therefore did not exhaust his administrative remedies regarding the February 2010 and October 2010 incidents. [Defendants' MTD 9]. Plaintiff's inmate appeal of the December 2009 incident was exhausted on July 15, 2010, the date of the director's level decision. [Plaintiff's Declaration in Support of Opposition to Motion to Dismiss ("Plaintiff's Decl."), Ex. O].

### February 7, 2010 and October 12, 2010 incidents

Defendants contend that plaintiff failed to administratively exhaust his claims arising from the February 7, 2010 and October 12, 2010 incidents prior to filing his complaint. Defendants' supporting declarations and exhibits demonstrate that they have no record of plaintiff's having filed an inmate appeal with respect to the February 7, 2010 incident. [Declaration of D. Foston in Support of Motion to Dismiss ("Foston Decl.") at 3–5 & Exs. A–C; Declaration of K. Chambers in Support of Motion to Dismiss ("Chambers Decl.") at 1–5 & Ex. A]. Plaintiff concedes that the February 7, 2010 incident "was not appealed for reasons of abusing the appeal system," but that he "brought it to the attention of defendants by way of letters to the Warden T. Busby, Warden Silvia Garcia, David Long, Matthew Cate" and the ISP appeals coordinator. [*See* Plaintiff's Opp. 4].

Defendants' evidence establishes that plaintiff exhausted his prison administrative remedies with respect to his claims arising from the October 12, 2010 incident via a "Group Appeal" on May 3, 2011, the date of a director's level decision denying that appeal. [Foston Decl., 3–4 & Ex. B; Chambers Decl., 4–5]. Plaintiff does not dispute the date of the director's level

---

**5.** All citations are to the 2009 version of the regulations, which was in effect at all times relevant to the complaint. The California inmate appeal regulations were extensively amended by an "emergency" regulation that was filed on December 31, 2010 and became effective on January 28, 2011.

decision regarding that appeal. [*See* Plaintiff's Decl., Ex. T]. This action was filed on April 4, 2011, the date plaintiff signed it and handed it to prison officials for mailing. [Complaint, Part I at 6 and attached "Proof of Service"]. *See Houston v. Lack*, 487 U.S. 266, 276, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988).[6]

Defendants' evidence establishes that plaintiff did not separately exhaust his prison administrative remedies with respect to the February 2010 and December 2010 incidents prior to filing this action. *See Vaden v. Summerhill*, 449 F.3d 1047 (9th Cir.2006) (holding that where a prisoner submits a complaint with an application to proceed in forma pauperis, exhaustion must occur before the prisoner tenders the complaint to the clerk by mailing it). However, plaintiff argues that because those two incidents "are evidence of the continual implementation of illegal policy," he was not required to separately exhaust each incident prior to filing this action challenging the lockdown policy, which was at issue in his appeal of the December 2009 incident. [Plaintiff's Opp. 5–6].

Plaintiff's argument that he was not obliged to separately exhaust the February 2010 and October 2010 incidents has merit. "[T]o properly exhaust administrative remedies prisoners must 'complete the administrative review process in accordance with the applicable procedural rules.'" *Jones*, 549 U.S. at 218, 127 S.Ct. 910 (quoting *Ngo*, 548 U.S. at 88, 126 S.Ct. 2378). At all relevant times, California law afforded state inmates the right to file an appeal regarding "any departmental decision, action, condition, or *policy* which they can demonstrate as having an adverse effect upon their welfare." Cal. Code Regs. tit. 15, § 3084.1(a) (2009) (italics added).

Moreover, the Ninth Circuit has held that while a prisoner is required to "exhaust 'available' remedies," that obligation persists only "as long as some remedy remains 'available.' Once that is no longer the case, then there are no 'remedies available,' and the prisoner need not further pursue the grievance." *Brown v. Valoff*, 422 F.3d 926, 935 (9th Cir.2005). Thus, "a prisoner need not press on to exhaust further levels of review once he has either received all 'available' remedies at an intermediate level of review or been reliably informed by an administrator that no remedies are available." *Brown*, 422 F.3d at 935.

Plaintiff's initial inmate appeal of the December 2009 incident resulting in his placement on modified program alleges that prison officials had no factual basis for asserting that he associated or was affiliated with Mexican inmates, and that prison officials unlawfully "racially profiled" him and discriminated against him due his Spanish surname and his Central American country of origin. Among other things, plaintiff requested that ISP "stop the use of racial profiling ...." [Exs. B4, B5]. The first level response, which was signed by defendant Pinson and Associate Warden Wells, stated that plaintiff was "appealing the issue of alleged 'racial profiling'" at ISP, and that plaintiff was concerned "over the issue of alleged discrimination against inmates designated as 'others' with Hispanic surnames." [Ex. B6]. Thus, prison officials were on notice that plaintiff was alleging that prison officials pursued an unwritten policy of racially profiling "Other" inmates whose ethnicity or surname could be described as Hispanic.

---

**6.** At the very latest, this action was filed on April 28, 2011, the date that it was filestamped by the Clerk.

Plaintiff's second-level appeal was even more explicit. Plaintiff specifically alleged that he did not associate with Mexican inmates and had been placed on lockdown status due to a "policy" which amounted to a discriminatory racial classification. Plaintiff alleged that "[t]his policy is not in place on every race or ethnicity," but rather was enforced against inmates who looked Hispanic or had Hispanic surnames. Plaintiff alleged, for example, that when "Black" inmates were locked down, "Asian" and "Islander" inmates who did, in fact, associate with them were not locked down. [Exs. B8 through B10].

Defendants Payton and Long acknowledged that plaintiff was claiming that "because you are Guatemalan you are being racially profiled, due to your being included as an 'Other' in the Modified Program for Hispanics." [Ex. B11]. They noted that within the CDCR, the term "Hispanic" referred to inmates of Latin, Spanish, or Portuguese descent living in the United States who speak—or whose parents or grandparents speak—"some dialect of the Spanish language." [Ex. B11]. They stated that inmates who do "not meet the criteria or definition for Hispanics" but "who associate or live with Hispanic inmates" were placed on modified program for safety and security reasons due to a code of inmate conduct ("Prison Politics") pursuant to which "Other" inmates who associate or live with Hispanics are "predisposed with a vested interest" to ally themselves for or against those inmates. Payton and Long asserted that all CDCR inmates "are subjected to the very same procedure when circumstances dictate," and that "[t]his practice is applicable to" inmates of all races and ethnicities. [Exs. B12–B13]. Payton and Long asserted that ISP's "policies ... have been implemented to conform with" CDCR rules and to maintain prison safety and security. [Ex. B13]. Although they denied that plaintiff had been racially profiled, Payton and Long advised plaintiff that "whenever the Hispanic population is placed on Modified Program or Lockdown status, so will you as an 'Other' who associates or lives with Hispanics." Payton and Long also noted that inmates of different ethnic backgrounds had previously "filed appeals on the same issues and were advised likewise." [Ex. B14].

The second level review response bolsters the conclusion that prison officials were aware that plaintiff was challenging what he contended was an unlawful, ongoing policy of racial profiling and discrimination, not merely a discrete or isolated incident of alleged discrimination.

In his request for director's level review, plaintiff contended that his "allegations of discrimination and unequal treatment have been avoided, if not flatly ignored," and that "without citation to any specific evidence, I have been arbitrarily associated with racial and prison gang activity—apparently on the sole basis of my 'Spanish' surname." [Ex. B15]. Plaintiff contended that he had "zero ties to any prison gang or racial group," there was no evidence linking him to prohibited activity, and that Payton and Long's references to "unwritten laws" and "prison politics" were "pure conjecture" that failed to demonstrate any application to plaintiff. Plaintiff argues that surname was "the only connection to qualifying as 'associating or living with Hispanics,' " and that "this practice is inherently unfair and amounts to discrimination." [Ex. B15].

The director's level appeal decision acknowledged that plaintiff was challenging "racial profiling," but concluded that prison "policies" allowing the warden to place "Hispanics" and those who associate or live with them on modified program status had been implemented to conform with CDCR rules and to maintain prison safety and security. [Ex. B1].

Plaintiff's inmate appeal of the December 2009 incident put prison officials on notice of his claims that he was being subjected to an unlawful, ongoing policy of racial profiling and racial discrimination. Plaintiff alleges that the February 2010 and October 2010 incidents were subsequent applications to him of the same unlawful policy. The CDCR's inmate appeal procedure allowed plaintiff to grieve a "policy" that adversely affect his welfare, and it did not require him to repeatedly exhaust discrete instances in which the allegedly unlawful policy was applied to him. *See* Cal. Code Regs. tit. 15, § 3084.1(a) (2009); *Mitchell v. Felker*, 2012 WL 2521827, at \*5 (E.D.Cal.2012) (holding that claims challenging allegedly race-based lockdowns that occurred after the plaintiffs filed an inmate appeal were exhausted where prison officials confirmed that they were on notice that the plaintiffs' inmate appeal challenged, and sought an end to, a " 'policy' of race-based lockdowns"). Therefore, plaintiff's administrative exhaustion of his claims arising from the December 2009 incident was sufficient to exhaust his claims regarding the February 2010 and October 2010 incidents.

### Section 1983 claims

 A section 1983 plaintiff bears the burden of pleading and proving two essential elements: (1) conduct that deprived the plaintiff of a right, privilege, or immunity protected by the Constitution or laws of the United States; and (2) the alleged deprivation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Johnson v. Knowles*, 113 F.3d 1114, 1119 (9th Cir.), *cert. denied*, 522 U.S. 996, 118 S.Ct. 559, 139 L.Ed.2d 401 (1997); *Leer v. Murphy*, 844 F.2d 628, 632–33 (9th Cir.1988).

### Fourteenth Amendment equal protection claim

Plaintiff alleges that defendants violated his equal protection rights by intentionally subjecting him to lockdowns or placing him on modified program status because of his Hispanic ethnicity or his national origin. Plaintiff also alleges defendants violated his equal protection rights by intentionally treating him differently than non-Hispanic "Other" inmates who associated with Mexican inmates or other disruptive group members, but were not locked down or placed on modified program status when the Mexican inmates or other disruptive group members were subjected to those restrictions.

Defendants contend that plaintiff's equal protection claim fails because plaintiff was locked down or placed on modified program status based on his conduct, not his race or ethnicity. [Defendants' MTD 11–13]. Defendants argue that plaintiff's complaint shows that he was locked down because he was "known to associate with Hispanic inmates," "because of the possibility of [plaintiff's] allying himself with a particular group for the sole purpose of retaliation," and because plaintiff "previously was validated as a member of the Mexican Mafia prison gang." [Defendants' MTD 12–13]. Defendants also contend that plaintiff's equal protection claim fails because some inmates with non-Hispanic surnames also were locked down with the Mexican inmates "based on their conduct and affiliation with the disruptive group, not by race." [Defendants' MTD 13].

### Equal Protection standard

 To state an equal protection claim, a plaintiff first must show that he "has been intentionally treated differently from others similarly situated ...." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060

(2000); *Silveira v. Lockyer,* 312 F.3d 1052, 1087–1088 (9th Cir.2002), *cert. denied,* 540 U.S. 1046, 124 S.Ct. 803, 157 L.Ed.2d 693 (2003). "Similarly situated" persons are those "who are in all relevant respects alike." *Silveira,* 312 F.3d at 1088 (quoting *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)). To allege an equal protection violation based on race or other protected status, the plaintiff "must show that the defendant acted with an intent or purpose to discriminate against him based upon his membership in a protected class. 'Intentional discrimination means that a defendant acted at least in part *because of* a plaintiff's protected status.' " *Serrano v. Francis,* 345 F.3d 1071, 1082 (9th Cir.2003) (emphasis in original) (citing *Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir.1998) and quoting *Maynard v. City of San Jose,* 37 F.3d 1396, 1404 (9th Cir.1994)), *cert. denied,* 543 U.S. 825, 125 S.Ct. 43 (2004).

■■■■ "Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race." *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (citation omitted). A prison classification based on race is "immediately suspect" and is subject to strict scrutiny. *Johnson v. California,* 543 U.S. 499, 505–506, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005). Like race, ethnicity and national origin are suspect classifications. *See Johnson,* 543 U.S. at 503, 508, 125 S.Ct. 1141 (holding that California's policy of temporarily segregating new inmates or transferees by race, ethnicity, and national origin for up to 60 days was an "express racial classification" triggering strict scrutiny). Strict scrutiny is required "in order to smoke out illegitimate uses of race by assuring that government is pursuing a goal important enough to warrant such a highly suspect tool." *Johnson,* 543 U.S. at 506, 125 S.Ct. 1141 (internal quotation marks and alteration omitted). Under *Johnson,* strict scrutiny means that the government must show that "reasonable men and women could not differ regarding the necessity of a racial classification in response to prison disturbances and that the racial classification was the least restrictive alternative (i.e., that any race-based policies are narrowly tailored to legitimate prison goals)." *Richardson v. Runnels,* 594 F.3d 666, 671 (9th Cir.2010) (as amended) (reversing summary judgment in favor of the defendant prison officials on an African–American inmate's equal protection claim alleging that assaults "that were believed to be perpetrated or planned by prisoners who were African–American led to the lockdown of all African–American inmates in a particular unit of the prison," where there was an absence of evidence showing a link other than race between the perpetrators and the other prisoners placed on lockdown, and therefore the defendants "made no evidentiary showing at all concerning the basis for regarding all African–Americans as a security risk when one or a few African–American inmates are responsible for an assault"). Prison classifications that burden fundamental rights but are not based on race generally pass constitutional muster if they are "reasonably related" to "legitimate penological interests." *See Johnson,* 543 U.S. at 509–510, 125 S.Ct. 1141 (citing *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

■■■ Contrary to defendants' contention, the complaint contains specific facts plausibly suggesting that defendants employed a suspect racial classification. Plaintiff alleges that he did not use the same showers as Mexican inmates or participate in dayroom activities with them, that defendants falsely asserted that plaintiff did so in order to justify placing him on modified program status, and that the actual reason defendants modified his pro-

gram was that plaintiff looked Hispanic, had a Hispanic surname, and spoke Spanish. Accepting those facts as true, plaintiff has pleaded facts plausibly suggesting that defendants used a race-based classification. Plaintiff also alleges that defendants were aware that "White" prisoners associated with Mexican inmates by using the same showers and playing cards or chess with them in the dayroom, but that "White" inmates were not placed on modified program status with the Mexican inmates. Plaintiff further alleges that defendants do not place "Other" inmates who associate with African–American inmates on modified program status when the African–American inmates are locked down. These facts also create an inference of intentional discrimination. *See Armstead v. Virga*, 2012 WL 2577562, at *4–*5 (E.D.Cal. July 3, 2012) (holding that the plaintiff's allegations that all African–American inmates were locked down following an incident between some African–American inmates and some Southern Hispanic inmates, and that he had nothing to do with the incident, stated a colorable equal protection claim).

Defendants' contention that plaintiff was locked down or placed on modified program status because he "previously was validated as a member of the Mexican Mafia prison gang" has no support in the record. That contention is based on facts recited in a document of which defendants requested the Court take judicial notice, specifically, an order issued in an action filed in the Northern District of California. [*See* Defendants' MTD 13 (citing Defendants' RJN, ¶¶ 2, 6 & Ex. 2 at AGO 54 through 57) ]. Defendants' request for judicial notice was denied because that action was filed by not by plaintiff, but by a different plaintiff named Raul Hernandez.

Defendants contend that an exhibit attached to the complaint indicates that some inmates with non-Hispanic surnames were placed on modified program status along with the Mexican inmates "based on their conduct and affiliation with the disruptive group, not by race," and that this document contradicts plaintiff's equal protection claims. [Defendants' MTD 13]. That a few non-Hispanic inmates were placed on modified program status due to "conduct or affiliation" with Mexican inmates is not dispositive. Liberally construed and drawing reasonable inferences in plaintiff's favor, his complaint does not allege that non-Hispanic inmates who associated or were affiliated with Mexican inmates *necessarily* or *inevitably* were excluded from modified program status when Mexican inmates were locked down. Instead, plaintiff alleges that he and "Other" Hispanic inmates were *always* placed on modified program status in lockstep with the lockdown of Mexican inmates, while non-Hispanic inmates who associated with Mexican inmates or disruptive inmates of other ethnic groups were not subjected to the same lockstep treatment, creating an inference that defendants applied a suspect racial classification to Hispanic "Other" inmates.

### Strict scrutiny analysis

Defendants argue that even if strict scrutiny applies, plaintiff's equal protection claims fail because their actions survive strict scrutiny. [Defendants' MTD 14].

First, defendants contend that plaintiff's "claim is not one of discrimination based on race," and that "to the contrary," plaintiff is asking the Court to allow prison officials to discriminate "by locking down 'only Hispanics' or 'only Others.'" [Defendants' MTD 14]. Next, defendants contend that, under *Johnson*, "prison authorities have the right, acting in good faith and *in particularized circumstances*, to take into account racial tensions in maintaining security, discipline, and good order in prisons and jails." *Johnson*, 543 U.S. at 507,

125 S.Ct. 1141 (italics in original) (quoting *Lee v. Washington,* 390 U.S. 333, 334, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (Black, Harlan, and Stewart, JJ., concurring)).

Defendants' argue that the prison's response was "narrowly tailored to control a prison disturbance by taking into account an inmate's conduct and alliance with a particular group of inmates, and racial tensions, in maintaining security," and that their actions "were a necessary and temporary response to prison assaults and the threat of race-related violence . . . ." [Defendants' MTD 14]. That argument lacks merit. First, plaintiff alleges that defendants did *not* properly take his conduct into account because he did not associate, affiliate himself, or ally himself with Mexican inmates, and that defendants placed him on modified program on the basis of a suspect classification, that is, due to his race, ethnicity, or national origin. [Complaint, Part II, at 8, 10 & Exs. B5, B8].

■ Second, defendants have not shown that their actions actually were narrowly tailored, which means that "reasonable men and women could not differ regarding the necessity of" the suspect classification, and that the suspect classification was the least restrictive alternative. *Richardson,* 594 F.3d at 671.

In *Lee,* which was cited in *Johnson,* the Supreme Court affirmed a declaratory decree holding that Alabama statutes requiring segregation in prisons and jails violated the Fourteenth Amendment. *Lee,* 390 U.S. at 333–334, 88 S.Ct. 994. The concurring justices "made explicit" that prison officials may "have the right to take into account racial tensions in maintaining security, discipline, and good order in prisons and jails" without offending the Fourteenth Amendment. *Lee,* 390 U.S. at 333–334, 88 S.Ct. 994. *Johnson* cited *Lee* as precedent for applying "a heightened standard of review in evaluating racial segregation in prisons," and for the proposition

that prison security and discipline are compelling government interests that can justify narrowly tailored racial classifications in prisons. *Johnson,* 543 U.S. at 506–507, 512, 125 S.Ct. 1141. In *Johnson,* however, the Supreme Court also held that California prison officials did *not* satisfy strict scrutiny merely by "cit[ing] racial violence as the reason for their policy" of segregating new inmates and transferees by race, even when the segregation was temporary and lasted no more than 60 days. *Johnson,* 543 U.S. at 502, 507, 125 S.Ct. 1141. *Johnson* explained that racial classifications "threaten to stigmatize individuals," "incite racial hostility," and "reinforce racial and ethnic divisions." *Johnson,* 543 U.S. at 507, 125 S.Ct. 1141. Furthermore, plaintiff alleges that the incidents that prompted his placement on modified program were all perpetrated by Mexican inmates against either staff or other Mexican inmates, so those incidents, standing alone, do not plausibly suggest a threat of racial violence involving "Other" inmates such as plaintiff. *Cf. Johnson,* 543 U.S. at 511, 125 S.Ct. 1141 ("When government officials are permitted to use race as a proxy for gang membership and violence without demonstrating a compelling government interest and proving that their means are narrowly tailored, society as a whole suffers.").

■ Under *Johnson* and *Lee,* defendants cannot obtain dismissal of plaintiff's equal protection claims by merely contending that their actions were a necessary and temporary response to the threat of racial violence. Plaintiff's complaint states a Fourteenth Amendment equal protection claim.

### Fourteenth Amendment due process claim

Defendants contend that plaintiff's complaint fails to state a cognizable due pro-

cess claim arising from plaintiff's placement on modified program. [Defendants' MTD 15–17].

 The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty or property. *Wilkinson v. Austin,* 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005); *Burnsworth v. Gunderson,* 179 F.3d 771, 774 (9th Cir.1999). "The Due Process Clause standing alone confers no liberty interest in freedom from state action taken within the sentence imposed." *Sandin v. Conner,* 515 U.S. 472, 480, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Nonetheless, states "may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293. "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson,* 545 U.S. at 221, 125 S.Ct. 2384 (internal citations omitted). In the prison context, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293; *see Wilkinson,* 545 U.S. at 223, 125 S.Ct. 2384 ("After *Sandin,* it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.' ") (quoting *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293). *Sandin's* approach applies to the question whether internal prison regulations create a protected liberty interest. *McQuillion v. Duncan,* 306 F.3d 895, 903 (9th Cir.2002).

 Plaintiff alleges that defendants violated his "rights to due process rights . . . under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution" by: (1) "associating [him] with known prison gang members based solely on" his ethnicity and Spanish surname [Complaint, Part II at 13]; and (2) by treating him differently than "White" or non-Hispanic "Other" inmates, who were not placed on modified program as a group for associating with Mexican or African–American inmates, respectively, even when the latter groups of inmates were locked down. [Complaint, Part II at 14]. The gist of those allegations is that defendants intentionally treated plaintiff differently due to his ethnicity from similarly situated "White" or non-Hispanic "Other" inmates. Plaintiff's right to be free from intentional discrimination on the basis of race or other suspect classification arises under the Fourteenth Amendment's Equal Protection Clause, not its Due Process Clause. *See Wolff,* 418 U.S. at 556, 94 S.Ct. 2963. Therefore, plaintiff's due process claim alleging that defendants intentionally discriminated against him on the basis of his protected status should be dismissed.

 Plaintiff also alleges that defendants violated his due process rights by conspiring not to address plaintiff's administrative appeal challenging this false "association." leading "rival gangs" and "even prison officials" to believe that plaintiff is affiliated with "Mexicans or Mexican gangs." [Complaint, Part II at 13]. Plaintiff's due process claim challenging the adequacy of the prison's administrative appeal procedure or the disposition of his administrative appeal fails because "inmates lack a separate constitutional enti-

tlement to a specific grievance procedure." *Ramirez v. Galaza,* 334 F.3d 850, 860 (9th Cir.2003) (citing *Mann v. Adams,* 855 F.2d 639, 640 (9th Cir.1988), *cert. denied,* 541 U.S. 1063, 124 S.Ct. 2388, 158 L.Ed.2d 963 (2004)). A prison grievance procedure "is a procedural right only," and "does not confer any substantive right upon the inmates." *Buckley v. Barlow,* 997 F.2d 494, 495 (8th Cir.1993) (per curiam); *accord, Massey v. Helman,* 259 F.3d 641, 647 (7th Cir.2001) (noting that "[t]he courts of appeals that have confronted the issue are in agreement" that a prison grievance procedure does not confer a protected liberty or property interest on inmates). "Ruling against a prisoner on an administrative complaint does not cause or contribute to [a section 1983] violation." *George v. Smith,* 507 F.3d 605, 609–610 (7th Cir. 2007) (internal citations omitted) (rejecting the argument that "anyone who knows about a violation of the Constitution, and fails to cure it, has violated the Constitution himself"); *see Jones v. Cannedy,* 2012 WL 3260457, at *4–*5 (E.D.Cal. Aug. 8, 2012) (holding that a "non-affiliated Black" inmate who alleged that prison officials included improperly included him in a "prolonged" modified program following a riot between certain Black and Southern Hispanic inmates did not state a due process claim "based solely on allegations that prison officials ignored, inadequately responded to, or failed to properly process, [his] prison administrative grievances.").

 Plaintiff further alleges that defendants' modification of his program violated his due process rights by causing him to endure "extended denials" of "rights and privileges" he otherwise enjoyed as a general population inmate "with respect to movement, feeding, ducats, visiting, work, shower, medical, library, dayroom, recreation, canteen, packages, phone calls, and religious services." [Complaint, Part II at 10, 13, 14]. In the narrative portion of his complaint, plaintiff alleges that he was wrongfully placed on modified program on December 6, 2009, February 7, 2010, and October 12, 2010. Plaintiff does not allege how long each modified program lasted, nor, with one exception, does the narrative portion of plaintiff's complaint plead specific facts regarding the nature and extent of the program modifications. Plaintiff also does not allege facts describing how his modified program compared with his normal program within the general population. The only deprivation that plaintiff specifically describes occurred on February 14, 2010, when plaintiff was denied a visit with his mother and other family members. [Complaint, Part II at 10]. The denial of a family visit is not an atypical and significant hardship and does not give rise to a protected liberty interest. *See Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 461, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) ("The denial of prison access to a particular visitor is 'well within the terms of confinement ordinarily contemplated by a prison sentence,' and therefore is not independently protected by the Due Process Clause.") (internal quotation marks and citation omitted); *Gerber v. Hickman,* 291 F.3d 617, 621 (9th Cir.2001) ("[I]t is well-settled that prisoners have no constitutional right while incarcerated to contact visits or conjugal visits.") (collecting cases).

Attached as exhibits to plaintiff's complaint are several "Program Status Report Part B–Plan of Operation/Staff & Inmate Notification" forms (the "Reports") concerning modified programming that was in effect, at a minimum, on the following dates: December 11–14, 2009; February 6–8, 2010; February 12–15, 2010; and October 20, 2010. [Exs. A2, A4, A5, A8]. It is unclear from the Reports whether, or to what extent, each modified program remained in effect beyond the dates indicated, because each Report states that the modified program at issue was subject to

review by prison officials at the expiration of the date(s) noted on the form. [Exs. A2, A4, A5, A8]. Each Report states the reason for the modified program at issue (e.g., "Battery on Staff") and contains checked boxes and a remarks section describing program modifications that were in effect for "Hispanic" inmates, or for "Hispanic" inmates and "Oth[ers] associated or living [with] His[panics]." [Exs. A2, A4, A5, A8]. The Reports uniformly state that "Black, White, and Other Inmates on facility D will remain on NORMAL PROGRAM." [Exs. A2, A4, A5, A8 (emphasis in originals)].

Each Report describes a specific combination of program modifications for the affected inmates. The nature and extent of some of the specified program modification is clear from the checked boxes or remarks (e.g., "No Dayroom Activities"), while in other instances, the substance of the restriction is less clear (e.g., "Movement" is "Controlled," with no further explanation on the Report). [Exs. A2, A8]. The program modifications reflected on each Report are not uniform. For example, the modified program that began on December 11, 2009 modified canteen privileges to "5 Hispanics at a time & Critical Workers," while the remaining Reports specify "No Canteen." [Exs. A2, A8]. The Reports indicate that some programming areas remained "normal" during the particular modified program to which the Report applies, or that a particular program modification was applied to some, but not all, of the otherwise affected inmates. [See, e.g., Ex. A2 (normal visiting and normal medical program for Hispanic inmates); Ex. A8 (certain categories of Hispanic and affiliated workers were released for work assignments)].

Plaintiff cites some of the Reports in the complaint, but he does not allege that the Reports accurately or completely describe the restrictions imposed on him during the relevant periods (whatever those may be). There also are inconsistencies between plaintiff's narrative allegations and the restrictions described in the Reports. For example, plaintiff cites one of the Reports for the proposition that "modified program status means, but [is] not limited to, the suspension of all affected inmates['] movement and privil[e]ges, and that ALL inmates will be fed in their cells." [Complaint, Part II at 6 (citing Ex. A2)]. However, Exhibit A2 states that the affected inmates retain some privileges, such as "normal visiting" and "normal medical program," while others, such as showering and phone calls, are restricted, but not suspended. Exhibit A2 also says that, along with a "sack meal lunch," affected inmates will have "controlled feeding in dining room," that such feeding will occur "housing unit section at a time." [Ex. A2]. In short, the complaint is vague and ambiguous as to the nature and duration of the particular restrictions plaintiff allegedly endured as a result of the modified programs at issue.

Plaintiff must show that he was subjected to conditions that "present a dramatic departure from the basic conditions of" his sentence in order to demonstrate the existence of a protected liberty interest. *Sandin,* 515 U.S. at 485, 115 S.Ct. 2293. In *Sandin,* the Supreme Court held that a prisoner did not have a protected liberty interest in avoiding a 30–day period of disciplinary segregation that "with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody." *Sandin,* 515 U.S. at 486, 115 S.Ct. 2293 (footnote omitted). The disciplinary segregation at issue in *Sandin* required the prisoner to "spend his entire time alone in his cell (with the exception of 50 minutes each day on average for brief exercise and shower periods, during

which he nonetheless remained isolated from other inmates and was constrained by leg irons and waist chains)," whereas in the general population he "would have left his cell and worked, taken classes, or mingled with others for" eight hours a day. *Sandin*, 515 U.S. at 494, 115 S.Ct. 2293 (Breyer and Souter, JJ., dissenting). The *Sandin* majority noted that, "[w]ith the exception of one extra phone call and one extra visiting privilege, inmates segregated for administrative reasons receive[d] the same privilege revocations as those segregated for disciplinary reasons," and that even general population inmates in that facility were "confined to cells for anywhere between 12 and 16 hours a day, depending on their classification." *Sandin*, 515 U.S. at 476 n. 2, 486 n. 8, 115 S.Ct. 2293. Therefore, the plaintiff's 30–day disciplinary segregation "did not work a major disruption in his environment" so as to trigger procedural due process protections. *Sandin*, 515 U.S. at 486, 115 S.Ct. 2293; *see Richardson*, 594 F.3d at 672–673 (affirming summary judgment in favor of defendants on a prisoner's due process claim where, after receiving what later was discovered to be fabricated information about a planned assault by a prison gang, the defendant prison officials placed inmates who were "determined to be either members, affiliates, associates, suspected gang sympathizers, or otherwise in communication or contact with the [gang] and their respective cellmates," including the plaintiff, in administrative segregation for two weeks pending an investigation).

Plaintiff's complaint and attached exhibits do not adequately allege the duration of each period of modified programming or the duration of specific program modifications, the nature and extent of specific program modifications to which plaintiff was subjected during each modified program period, or the nature of plaintiff's "normal" program compared to each of the modified programs in question. The complaint also alleges no facts from which it may reasonably be inferred that plaintiff's placement on modified program "invariably affect[ed]" the duration of his sentence. Therefore, the complaint does not plead specific facts plausibly suggesting that plaintiff experienced any atypical and significant hardship in relation to the ordinary incidents of prison life giving rise to a protected liberty interest under *Sandin*. *See Walton v. Sing*, 2011 WL 4928675, at *4 (E.D.Cal. Oct. 17, 2011) (holding that a prisoner who alleged that he was subjected to a prison lockdown for thirty days after a prison riot failed to demonstrate an atypical and significant hardship under *Sandin*) (citing *Wade v. Maddock*, 229 F.3d 1161, 2000 WL 917598 (9th Cir.2000) ("[W]e do not believe that the two-month lockdown can, as a matter of law, constitute a protected liberty interest under *Sandin* ....") (unpublished decision)), *report and recommendation adopted, Walton v. Sing*, 2011 WL 6141023 (E.D.Cal. Dec. 9, 2011); *Corona v. Harrington*, 2010 WL 318555, at *8–*9 (E.D.Cal. Jan. 20, 2010) (holding that the decision to continue a sub-group of inmates on lockdown after an attack on staff was not a disciplinary measure but rather "essentially a matter of administrative discretion," and did not trigger procedural due process guarantees); *Estate of Torres v. Terhune*, 2002 WL 32107951, at *7 (E.D.Cal. Jan. 9, 2002) (holding that a prisoner's due process rights were not violated when he was placed on lockdown for over two months without notice or hearing" because the prisoner's restricted access to programs and activities for a limited period was "well within the terms of confinement ordinarily contemplated by a prison sentence").

Moreover, in a pre-*Sandin* case, the Ninth Circuit held that continuance of a prison-wide lockdown "for more than a short time without some sort of notice and

hearing at which the inmates could participate" did not violate the plaintiffs' due process rights. *Hayward v. Procunier,* 629 F.2d 599, 601 (9th Cir.1980), *cert. denied,* 451 U.S. 937, 101 S.Ct. 2015, 68 L.Ed.2d 323 (1981). The lockdown in *Hayward* lasted more than five months in total. Inmates were confined to their cells for 24 hours a day during the first two weeks; during the remainder of the lockdown, some restrictions were gradually eased, while others remained in effect the entire time. *See Hayward,* 629 F.2d at 601–602. The Ninth Circuit held that: (1) California state prison regulations, practices, and customs did not create a legitimate expectation among inmates in avoiding the increased level of security represented by a lockdown imposed following inmate-on-inmate attacks, or, as a general matter, in "any particular level of prison-wide security"; (2) the inmates on lockdown were not "being subjected to treatment wholly outside the foreseeable consequences of criminal conviction"; and (3) the issue in *Hayward* was not the conduct or fate of individual prisoners who were seeking a due process hearing, distinguishing that case from "every case cited by plaintiffs or revealed by our research in which prisoners were found to be entitled to a due process hearing. . . ." *Hayward,* 629 F.2d at 601–602. "Instead, the question to be decided is whether the degree of emergency justifies a continuation of the lockdown." *Hayward,* 629 F.2d at 601–602.

Although it altered the methodology for evaluating prisoner due process claims, *Sandin* does not call into question *Hayward's* holding that no protected liberty interest existed. First, *Hayward* has not been overruled, and it has been applied post *Sandin* in cases raising due process claims. *See, e.g., Hurd v. Garcia,* 471 Fed.Appx. 798 (9th Cir.2012) (affirming summary judgment in favor of the defendant prison officials on a due process claim

arising from a lockdown); *Corona,* 2010 WL 318555, at \*8–\*9 (dismissing due process claim arising from a lockdown).

Second, *Hayward's* conclusion that the increased security represented by a lockdown is a "foreseeable consequence of a criminal conviction" indicates that a modified program in response to assaults by inmates on staff and other inmates, even one lasting for a few months, is not an atypical and significant hardship relative to the ordinary incidents of prison life.

Third, *Sandin* receded from the due process methodology of *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) in part because "the *Hewitt* approach" had "led to the involvement of federal courts in the day-to-day management of prisons," which ran "counter to the view expressed in several of our cases that federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Sandin,* 515 U.S. at 482, 115 S.Ct. 2293. To counteract this "undesirable effect," the *Sandin* Court "return[ed] to the due process principles" reflected in *Wolff* and *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). *Sandin,* 515 U.S. at 483, 115 S.Ct. 2293.

Consistent with the due process principles later articulated in *Sandin,* the Ninth Circuit relied on *Wolff* and *Meachum* to support its due process analysis in *Hayward,* and it also took into account the need to afford deference to prison officials in making decisions respecting the continuance of lockdown and the pace of return to normal operations. *See Hayward,* 629 F.2d at 601–602 (citing *Gilliard v. Oswald,* 552 F.2d 456, 459 (2d Cir.1977) (reversing judgment on due process claim in favor of prisoners who were segregated and locked down for approximately five weeks following a series of assaults because the defendant prison superintendent was entitled to

"wide discretion in the use of protective confinement" to preserve prison safety and security, and "[h]is judgment should prevail absent a clear showing of gross abuse"); *see also Hayward*, 629 F.2d at 603 (noting, in the context of an Eighth Amendment analysis, that decisions to maintain or ease restrictions during a lockdown "are delicate ones, and those charged with them must be given reasonable leeway").

■ Finally, *Sandin* did not invalidate the distinction that the Ninth Circuit drew in *Hayward* between a lockdown imposed on a group of inmates in response to inmate assaults and an individualized disciplinary determination affecting a particular inmate's conditions of confinement. *Hayward* explains that the decision to lock down a cell block or an entire prison is "a rule change of general applicability affecting an entire class of prisoners. Since such a rule change is not directed at particular persons, individual prisoners are neither more acutely affected by it than other members of their class nor uniquely able to bring personal knowledge to bear on the appropriateness of its implementation." *Hayward*, 629 F.2d at 603 (quoting *Johnson v. Anderson*, 370 F.Supp. 1373, 1382 (D.Del.1974)); *see also Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir.1991) (per curiam) (holding that no due process hearing was necessary prior to imposing a "cell lockdown" confining all inmates who were not working or attending classes to their cells, but noting that if "this treatment were meted out as punishment, this would perhaps constitute a cognizable claim").

Under *Sandin* and *Hayward*, the facts alleged in plaintiff's complaint and attached exhibits are insufficient to show that plaintiff had a protected liberty interest in avoiding the modified programs about which he complains.

For all of the reasons described above, plaintiff's complaint fails to state a procedural due process claim, and defendants' motion to dismiss should be granted in that respect.

## Eighth Amendment

Defendants contend that the complaint fails to state an Eighth Amendment claim. [Defendants' MTD 17–18].

■ Under the Eighth Amendment, a prisoner's constitutional rights may be violated by prison conditions that render his confinement cruel and unusual. *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Prison conditions are cruel and unusual if they result in the wanton and unnecessary infliction of pain. *Whitley*, 475 U.S. at 319, 106 S.Ct. 1078; *Rhodes*, 452 U.S. at 346. The unnecessary and wanton infliction of pain includes those sanctions that "totally without penological justification." *Rhodes*, 452 U.S. at 346; *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir.1982).

■ Prison officials "must provide humane conditions of confinement," "must ensure that inmates receive adequate food, clothing, shelter, and medical care," and "must 'take reasonable measures to guarantee the safety of the inmates[.]'" *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). The Constitution, however, "does not mandate comfortable prisons." *Rhodes*, 452 U.S. at 349, 101 S.Ct. 2392. "[R]outine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society,'" and therefore "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995,

117 L.Ed.2d 156 (1992) (quoting *Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392).

In order to state a claim for violation of the Eighth Amendment, plaintiff must satisfy both an objective and a subjective element. To satisfy the objective element of an Eighth Amendment claim, he must show the alleged violation was "sufficiently serious," resulting in the denial of "the minimal civilized measure of life's necessities," in violation of "contemporary standards of decency." *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970; *Hudson,* 503 U.S. at 9, 112 S.Ct. 995; *Rhodes,* 452 U.S. at 347, 101 S.Ct. 2392; *Johnson v. Lewis,* 217 F.3d 726, 731 (9th Cir.2000), *cert. denied,* 532 U.S. 1065, 121 S.Ct. 2215, 150 L.Ed.2d 209 (2001).

Second, plaintiff must show that defendants acted with a "sufficiently culpable state of mind." *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970; *see Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Johnson,* 217 F.3d at 731. A plaintiff satisfies the subjective element by showing that the defendants acted with "deliberate indifference" to inmate health or safety, in that the defendants knew that the plaintiff faced a substantial risk of serious harm and disregarded the risk by failing to take reasonable measures to abate it. *See Farmer,* 511 U.S. at 828, 834, 847, 114 S.Ct. 1970; *Wilson,* 501 U.S. at 303, 111 S.Ct. 2321; *Wallis v. Baldwin,* 70 F.3d 1074, 1077 (9th Cir.1995).

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) "associating [him] with known prison gang members based solely on" his ethnicity and Spanish surname [Complaint, Part II at 12]; (2) conspiring not to address his "administrative appeal issue of not being associated with either the Mexican or Mexican gangs," resulting in a belief by "rival gangs" that plaintiff is "affiliated with these disruptive groups"; (3) placing plain-

tiff on continual lockdown whenever Mexican inmates are locked down due to an incident; (4) treating plaintiff differently than "White" inmates, who were not placed on modified program as a group for associating with Mexican inmates when those inmates were locked down; and (5) by subjecting plaintiff to "extended denials" of "rights and privileges" he otherwise enjoyed as a general population inmate with respect to movement, feeding, ducats, visiting, work, shower, medical, library, dayroom, recreation, canteen, quarterly packages, phone calls, and religious services. [Complaint, Part II at 10, 12–13].

As previously noted, plaintiff's right to be free from intentional discrimination on the basis of his race, ethnicity, or national origin is grounded in the Fourteenth Amendment's Equal Protection Clause, not the Eighth Amendment. *See Wolff,* 418 U.S. at 556, 94 S.Ct. 2963. In addition, plaintiff does not have a constitutional right under the Eighth Amendment or otherwise to have his administrative appeal processed or decided in a particular manner. *Ramirez,* 334 F.3d at 860; *Buckley,* 997 F.2d at 495; *Mann,* 855 F.2d at 640. Therefore, the first, second, third, and fourth grounds enumerated above do not state an actionable Eighth Amendment claim.

Plaintiff's complaint does not allege facts plausibly suggesting that he was subjected to program modifications that were objectively sufficiently serious to constitute an Eighth Amendment violation. The circumstances, nature, and duration of a deprivation of "life's necessities" must be considered in determining whether a constitutional violation has occurred. *Johnson,* 217 F.3d at 731. As previously explained, plaintiff has not adequately alleged either the duration or the specific nature of the deprivations to which he personally was subjected. Therefore, he

has failed to plead specific facts plausibly suggesting that he was denied the minimal civilized measure of life's necessities, as required to make out the objective element of his Eighth Amendment claim.

■■■ In addition, plaintiff alleges that the lockdowns and modified programs described in the complaint were implemented in response to a series of inmate attacks in Facility D. The first incident was a battery on staff, and the others incidents were described as a battery on an inmate with a weapon resulting in serious injury. [Complaint, Part II at 6–11 & Exs. A2, A4, A5, A8]. Although the duration of the modified programs is unclear, they clearly were temporary, in that plaintiff alleges that defendants cause him to be subjected to three separate modified programs between December 2009 and October 2010. In, the Reports indicate that prison officials undertook regular review of those programs while they were in effect. [Exs. A2, A4, A5, A8]. Those facts are relevant to the Eighth Amendment analysis because "prison officials have a duty to keep inmates safe, and in particular to protect them from each other. Officials must balance this imperative against other obligations that our laws impose." *Norwood v. Vance,* 591 F.3d 1062, 1069 (9th Cir.2010), *cert. denied,* —— U.S. ——, 131 S.Ct. 1465, 179 L.Ed.2d 299 (2011). Prison officials' duty "to protect prisoners from violence at the hands of other prisoners" is relevant to determine whether a prison condition "squares with evolving standards of decency" for purposes of the objective element of an Eighth Amendment claim, and whether the plaintiff was "incarcerated under conditions posing a substantial risk of serious harm" for purposes of the subjective element of such a claim. *See Farmer,* 511 U.S. at 833–834, 114 S.Ct. 1970 (internal quotation marks omitted). The December 2009 incident of a battery on staff also is relevant to the Eighth Amendment analysis because "[a]ttacks on

staff are, by their nature, more serious challenges to prison authority than attacks on other inmates." *Norwood,* 591 F.3d at 1070 (holding that prison officials were entitled to qualified immunity from Eighth Amendment claims arising from the imposition of general and inmate-specific lockdowns following "serious inmate assaults on staff" and "inmate-on-inmate attacks"). Accepting as true plaintiff's allegations that defendants instituted the modified programs at issue in response to attacks by inmates on staff and other inmates, plaintiff has not alleged specific, additional facts plausibly suggesting that in so doing, defendants were deliberately indifferent to a substantial risk of serious harm to plaintiff.

Plaintiff's complaint does not plead facts satisfying either the objective or subjective elements of an Eighth Amendment claim. Therefore, defendants' motion to dismiss plaintiff's Eighth Amendment claim should be granted.

**Causation**

Defendants contend that plaintiff's allegations are insufficient to show that the named defendants personally participated in or caused a deprivation of plaintiff's rights. [Defendants' MTD 19–20].

■■■ An individual defendant, including a supervisory official, is not liable on a civil rights claim unless the facts establish the defendant's personal involvement in the constitutional deprivation or a causal connection between the defendant's wrongful conduct and the alleged constitutional deprivation. *See Redman v. County of San Diego,* 942 F.2d 1435, 1446 (9th Cir.1991) (en banc), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992); *Hansen v. Black,* 885 F.2d 642, 646 (9th Cir.1989); *Johnson v. Duffy,* 588 F.2d 740, 743–744 (9th Cir.1978). "A plaintiff must allege facts, not simply conclusions, that show that an individual was personal-

ly involved in the deprivation of his civil rights." *Barren v. Harrington,* 152 F.3d 1193, 1194 (9th Cir.1998), *cert. denied,* 525 U.S. 1154, 119 S.Ct. 1058, 143 L.Ed.2d 63 (1999). "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy,* 844 F.2d 628, 633 (9th Cir.1988). The plaintiff must demonstrate that the defendant's conduct was both the but-for and proximate cause of the alleged injury. *Harper v. City of Los Angeles,* 533 F.3d 1010, 1026 (9th Cir. 2008).

▆▆▆ Plaintiff alleges that defendants Cate and Busby, the Secretary of the CDCR and the Warden of ISP, respectively, are liable under section 1983 because they are responsible for ensuring the safety and well-being of prisoners under their supervision. [Complaint, Part I at 2]. Supervisory officials cannot be held vicariously liable for their subordinates' alleged misconduct. Furthermore, a supervisor's "knowledge or acquiescence in their subordinates' use of discriminatory criteria to make classification decisions" is insufficient to state a claim for intentional discrimination against the supervisor because a showing of discriminatory *purpose,* and not merely knowledge, is an element of a claim for unconstitutional discrimination. *Iqbal,* 556 U.S. at 677, 129 S.Ct. 1937. A claim for deliberate indifference does not require a showing of unlawful purpose; however, a section 1983 plaintiff must do more than allege "raw legal conclusions with insufficient facts to support them." *Starr v. Baca,* 652 F.3d 1202, 1208, 1218 (9th Cir.2011) (reversing dismissal for failure to state a claim of a complaint containing "detailed factual allegations that go well beyond reciting the elements of a claim of deliberate indifference" that "plausibly suggest that [the de-

fendant] acquiesced in the unconstitutional conduct of his subordinates").

▆▆▆ The complaint contains no specific, non-conclusory facts showing Cate's personal involvement or participation in subjecting plaintiff to the modified programs that allegedly violated his Eighth and Fourteenth Amendment rights. Plaintiff's allegation that he sent a copy of his inmate appeal to Cate in April 2010 is insufficient to state a claim for intentional discrimination against a supervisory official such as Cate under *Iqbal.* Moreover, merely sending a copy of an appeal to Cate, without more, is insufficient to plausibly suggest that Cate was subjectively aware of facts showing that plaintiff faced a substantial risk of serious harm and disregarded that risk. Therefore, the complaint fails to state an actionable section 1983 claim against Cate. *See Lacey v. Maricopa,* 649 F.3d 1118, 1136 (9th Cir. 2011) (affirming dismissal of section 1983 supervisory liability claims against a sheriff where the plaintiff's allegations were "long on conjecture but short on the factual nexus necessary to sustain a claim").

▆▆▆ The situation is different with respect to Busby, ISP's warden. The responses to plaintiff's inmate appeals cite the authority of the warden to implement lockdowns and modified programs at issue in this case and directly implicate the warden in the decisions regarding those program modifications. [*See, e.g.,* Ex. B1 (stating that "the warden or his designee has the authority to implement" lockdowns and modified programs, and noting that although plaintiff "may not agree with a decision to modify programs, he must understand that the Administration is responsible for their decision and must insure that all avenues have been explored and it is safe to unlock, prior to their decision to return to normal programming"); Ex. B11 (stating that California

prison regulations state that the warden must have a plan for "meeting emergencies, such as ... attacks upon inmates," and that "[t]he PSR or Modified Program Plan of Action signed by the warden or their designee can suspend any operation, procedure, service or function to prevent, contain, or control a disturbance."). Defendants' express reliance on the warden's authority and discretion to justify the modified programs at issue and deny plaintiff relief at the administrative relief are sufficient to show the warden's personal involvement in the alleged deprivations of plaintiff's rights.

■■■ Defendants also contend that plaintiff's allegations against defendants Phillips, Long, Arneson, and Palmer are based solely on their role in processing plaintiff's appeals. [Defendants' MTD 20–21]. That contention appears to be correct with respect to Phillips and Arneson. [*See* Complaint, Part I at 2, 4; Complaint, Part II at 2, Exs. B2, B6]. Plaintiff cannot state a section 1983 claim based solely on their role in the inmate appeals process. *See Iqbal*, 556 U.S. at 677, 129 S.Ct. 1937; *Ramirez*, 334 F.3d at 860; *see Jones*, 2012 WL 3260457, at *4–*5.

■■■ Plaintiff's allegations against Long and Palmer are not limited to any role they may have had in processing his appeals. [*See* Complaint, Part I at 3–4, Complaint, Part II at 4–5, 10, 12; Exs. A6, A7, A8, B5]. The complaint and attached exhibits contain sufficient factual matter, accepted as true, to plausibly suggest that defendants Long and Palmer were involved in authorizing or implementing the modified programs at issue. Therefore, defendants' motion to dismiss should be granted as to Cate, Phillips, and Arneson, but denied as to Busby, Long and Palmer.

**Official capacity claims for damages and injunctive relief**

Defendants contend that plaintiff's damages claims against them in their official capacity are barred by the Eleventh Amendment. [Defendants' MTD 21]. They also contend that his prayer for injunctive relief should be stricken.

■■■ State officers acting in their official capacities receive Eleventh Amendment immunity from claims for monetary relief. *Hafer v. Melo*, 502 U.S. 21, 25, 27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Pena v. Gardner*, 976 F.2d 469, 472–473 (9th Cir.1992). The Eleventh Amendment does not, however, bar suits for prospective injunctive relief against state officials in their official capacity. *See Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 267–269, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 102–106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Ex parte Young*, 209 U.S. 123, 159–160, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Doe v. Lawrence Livermore Nat. Lab.*, 131 F.3d 836, 839 (9th Cir.1997). "[I]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' " *Virginia Office for Protection & Advocacy*, —— U.S. ——, 131 S.Ct. 1632, 1639, 179 L.Ed.2d 675 (2011) (quoting *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002)). "An allegation of an ongoing violation of federal law is ordinarily sufficient." *Verizon Md. Inc.*, 535 U.S. at 646, 122 S.Ct. 1753 (quoting *Coeur d'Alene*, 521 U.S. at

281, 117 S.Ct. 2028) (emphasis in original; ellipsis omitted).

■■■ An plaintiff requesting injunctive relief also must establish Article III standing by showing a real and immediate threat that the plaintiff will be wronged again in a similar way. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

■■■ Plaintiff requests an order enjoining defendants from "engaging in the unlawful conduct alleged in this complaint." [Complaint, Part II at 15]. He further alleges that if an injunction does not issue, he "will continue to be placed on lockdowns and denied the rights and privileges because of [his] race and surname being Spanish." [Complaint, Part II at 15]. Plaintiff's complaint states an equal protection claim and alleges facts plausibly suggesting that defendants will continue to violate his equal protection rights by following the same policy of placing "Other" Hispanic inmates on modified program when Mexican inmates are locked down. Therefore, plaintiff has stated a claim for prospective injunctive relief against defendants in their official capacity.

## RICO

Defendants contend that plaintiff's allegations fail to state a claim under the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* [Defendants' MTD 5 n. 3].

■■■ RICO's civil remedy section permits suit by persons injured in their businesses or property. *Compton v. Ide*, 732 F.2d 1429, 1433 (9th Cir.1984), *abrogated on other grounds, Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 149–150, 156–157, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987); *see* 18 U.S.C. § 1964(c). To state a claim under RICO, plaintiff must allege facts establishing: "(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering ac-

tivity (known as 'predicate acts'); (5) causing injury to the plaintiff's 'business or property.' " *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir.1996), *cert. dismissed*, 519 U.S. 233, 117 S.Ct. 759, 136 L.Ed.2d 674 (1997); *see Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Plaintiff's complaint includes wholly conclusory allegations that defendants' alleged violations of plaintiff's Eighth and Fourteenth Amendment rights also "violate RICO." [Complaint, Part II at 10, 12, 14]. The complaint fails to state a civil RICO claim. *See Silva v. Di Vittorio* 658 F.3d 1090, 1105–1106 (9th Cir.2011) (affirming dismissal without leave to amend of a prisoner's "frivolous" RICO claim because even if the defendant prison officials' alleged misconduct violated plaintiff's civil rights, their acts did not qualify as predicate acts of racketeering activity under § 1961(1)).

## Qualified immunity

Defendants contend that even if the complaint states a cognizable federal claim, they are entitled to qualified immunity. [Defendants' MTD 22–24].

■■■ The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). If the facts demonstrate that no constitutional violation occurred, there is no need to proceed further with the qualified immunity analysis. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Regardless of whether or not a constitutional violation occurred, qualified immunity is available if

the right allegedly violated was not "clearly established." The "clearly established" inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition," *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, and it "turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Pearson,* 555 U.S. at 244, 129 S.Ct. 808 (quoting *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen,* 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (quoting *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151). Plaintiff bears the burden of showing that the right at issue was clearly established. *Alston v. Read,* 663 F.3d 1094, 1098 (9th Cir.2011).

**Clearly established law-equal protection claim**

 Because the complaint states an equal protection claim, defendants are not entitled to qualified immunity if plaintiff's right to be free from intentional discrimination in connection with his placement on modified program was "clearly established." Defendants argue that *Johnson* did not "'clearly establish' that the segregation of California inmates on lockdown status to prevent gang violence, given the circumstances existing at ISP, was unconstitutional." [Defendants' MTD 23].

Plaintiff, however, does not allege that placing inmates on lockdown or modified program to prevent gang violence necessarily is unlawful; instead, he alleges facts

plausibly suggesting that he was placed on modified program based on his race, ethnicity, or national origin, and in a manner that was not narrowly tailored to promote prison security or order. In *Richardson,* the Ninth Circuit held that the Supreme Court's decision in *Johnson,* which pronounced racial classifications in prison "immediately suspect" and subject to strict scrutiny, was "the relevant precedent" for evaluating the merits of a prisoner's equal protection claim arising from a racially discriminatory lockdown in *2003. Richardson,* 594 F.3d at 671–672. *Richardson* also observed that the defendants' race-based lockdown did not pass muster even under the "weaker standard" that governed racial classifications in prisons before *Johnson* because the defendants had articulated nothing other than a "belief" or perception to support locking down all African–American inmates when only some of them perpetrated violent acts. *See Richardson,* 594 F.3d at 672.[7]

Under *Johnson,* it would have been clear to a reasonable prison official in December 2009 and 2010 that it was unlawful to place plaintiff on modified program on the basis of his race, ethnicity, or national origin. On analogous facts, at least one other district court has denied a motion to dismiss on the basis of qualified immunity under the "clearly established law" prong. *See Armstead,* 2012 WL 2577562, at *6–*7. Accordingly, defendants' motion to dismiss plaintiff's equal protection claims on the basis of qualified immunity should be denied.

**Clearly established law-Eighth Amendment claim**

 The complaint does not plead sufficient factual matter, accepted as true, to

---

7. Prior to the Supreme Court's decision in *Johnson,* the Ninth Circuit applied the "reasonableness" standard of *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). *See Johnson v. California,* 321 F.3d 791 (2003), *rev'd,* 543 U.S. 499, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005).

satisfy the objective or subjective elements of an Eighth Amendment claim arising from plaintiff's placement on modified program following the attacks on staff and inmates described in the complaint.

Even if plaintiff's allegations as presently pled could be construed to state an Eighth Amendment claim, defendants would be entitled to qualified immunity. In *Noble v. Adams*, 646 F.3d 1138 (2011), the Ninth Circuit reversed the denial of qualified immunity to prison officials who imposed a prison-wide lockdown in January 2002 after a "violent riot" in a prison exercise yard in which inmates attacked staff. After three months, prison officials gradually began a process of restoring privileges, until another riot occurred at the beginning of August 2002, leading to a prolongation of the lockdown, with full outdoor exercise privileges not restored until April 2003. The plaintiff, who was not implicated in the riots, brought an Eighth Amendment claim challenging the denial of outdoor exercise during the lockdown. *Noble*, 646 F.3d at 1140–1141.

Relying primarily on *Norwood*, the Ninth Circuit

> conclude[d] pursuant to what is now known as prong 2 of the [*Saucier*] test, that it was not clearly established in 2002—nor is it established yet—precisely how, according to the Constitution, or when a prison facility housing problem inmates must return to normal operations, including outside exercise, during and after a state of emergency called in response to a major riot, here one in which inmates attempted to murder staff.

*Noble*, 646 F.3d at 1142–1143. *Noble* relied heavily on *Norwood*, in which the Ninth Circuit granted the defendant prison officials qualified immunity from Eighth Amendment claims arising from "four separate extended lockdowns over the course of two years" on the ground that they

were entitled to "wide-ranging deference" in imposing the lockdowns due to prison violence, including attacks on staff. *Noble*, 646 F.3d at 1143 (citing *Norwood*, 591 F.3d at 1065–1070).

Nothing in plaintiff's complaint materially distinguishes this case from *Noble*. Therefore, dismissal of this claim is warranted under both prongs of the *Saucier* qualified immunity test.

**Clearly established law-due process claim**

As explained above, the complaint does not state a procedural due process claim because plaintiff has not alleged facts showing that his placement on modified program rose to the level of an atypical and significant hardship in relation to the ordinary incidents of prison life.

Even if plaintiff's allegations as presently pled could be construed to state a due process claim, plaintiff has not cited, nor has the Court found, authority for the proposition that a reasonable official would have known that placing plaintiff on modified program following inmate attacks on staff and other inmates created an "atypical and significant hardship" triggering procedural due process protections. The existing authority indicates that an inmate does not have a protected liberty interest triggering the requirement of notice and a hearing when prison officials impose a lockdown or modified program lasting a few weeks or even a few months in response to prison violence involving attacks on inmates or staff. *See Richardson*, 594 F.3d at 672–673; *Johnson*, 948 F.2d at 519; *Hayward*, 629 F.2d at 601–602; *Corona*, 2010 WL 318555, at *8–*9; *Estate of Torres*, 2002 WL 32107951, at *7.

Therefore, dismissal of this claim also is warranted on qualified immunity grounds.

**Unserved defendant**

Defendants note that named defendant D. Pinson has not appeared in this action

and has not been served with the summons and complaint. The United States Marshal's office has been unable to effect service on Pinson, even after making an additional inquiry at the Court's request. [Order filed Sept. 27, 2011[8]; Process Receipt filed Aug. 17, 2011]. Pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, plaintiff's claims against Pinson should be dismissed without prejudice for failure to timely serve the summons and complaint.

**Deceased defendant**

On September 22, 2011, defendants filed and served a statement noting the death of defendant M. Payton. Under Rule 25(a) of the Federal Rules of Civil Procedure,

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

No motion for substitution has been filed. Accordingly, plaintiff's claims against Payton should be dismissed with prejudice.

**Recommendation**

For the foregoing reasons, defendants' motion to dismiss should be **denied** as to: (1) plaintiff's exhaustion of administrative remedies; and (2) plaintiff's Fourteenth Amendment equal protection claims against Long, Wiggins, Busby, Rettagliata, and Palmer in their individual capacity and in their official capacity for prospective injunctive relief.

Defendants' motion to dismiss should be **granted** as to: (3) plaintiff's Fourteenth Amendment due process claims; (4) plaintiff's Eighth Amendment claims; (5) plaintiff's RICO claims; (6) plaintiff's claims against defendants in their official capacity for damages; (7) plaintiff's claims against Cate, Phillips, and Arneson in their individual and official capacities; (8) plaintiff's claims against unserved defendant Pinson; and (9) plaintiff's claims against deceased defendant Payton.

Plaintiff's RICO claims, his damages claims against defendants in their official capacity, and his claims against deceased defendant Payton should be dismissed with prejudice. Plaintiff's claims against Pinson should be dismissed without prejudice and without leave to amend.

However, plaintiff is entitled to an opportunity to attempt to correct the factual defects in his dismissed Eighth and Fourteenth Amendment claims (except as to Pinson and Payton) because it is not absolutely clear that plaintiff cannot plead additional facts that would state a cognizable claim and that would avoid the qualified immunity bar. *See Ramirez,* 334 F.3d at 861 (9th Cir.2003) ("Leave to amend should be granted unless the pleading 'could not possibly be cured by the allegation of other facts,' and should be granted more liberally to pro se plaintiffs.") (quoting *Lopez v. Smith,* 203 F.3d 1122, 1130, 1131 (9th Cir.2000) (en banc)). Accordingly, plaintiff's Eighth and Fourteenth Amendment claims should be dismissed with leave to amend.[9]

---

8. The United States Marshal's office responded informally to the Court's order, and that is deemed sufficient compliance under the circumstances.

9. A separate order will issue giving plaintiff instructions regarding the filing of an amended complaint.